## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Action No. 18-cr-00508-CMA

UNITED STATES OF AMERICA,

      Plaintiff,

v.

DANIEL B. RUDDEN,

      Defendant.

---

## PLEA AGREEMENT

---

The United States of America (the Government), by and through Martha A. Paluch and Rebecca S. Weber, Assistant United States Attorneys for the District of Colorado, and the defendant, Daniel B. Rudden, personally and by counsel, Natalie Stricklin, Assistant Federal Public Defender, submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1.

### I.    AGREEMENT

The plea agreement is submitted pursuant to Fed. R. Crim. P. 11(c)(1)(A) and (B).

*Defendant's Obligations:*

(1)   The defendant agrees to waive the right to Indictment, and plead guilty to a one-count Information, charging the offense of Mail Fraud, in violation of 18 U.S.C. § 1341.   The defendant further agrees to admit to the asset forfeiture allegation in the Information, as outlined more fully below.

**COURT EXHIBIT 1**

(2)   The defendant agrees, pursuant to 18 U.S.C. § 3663(a)(3), to pay restitution to the victims of his offense to be identified, and in amounts determined, prior to sentencing. The defendant waives any defense based on the statute of limitations. The defendant also agrees that for purposes of calculating the U.S. Sentencing Guidelines, the loss amount is between $9,500,000 and $25,000,000.   The defendant understands that restitution will be imposed as due and payable immediately after judgment is entered.

(3)   The defendant agrees that the projected offense level asserted by the parties as set forth hereafter in Part VI, is the same position the defendant will take at the time of sentencing as it relates to the various applicable guideline provisions.

(4)   The defendant is aware that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed.   Understanding this and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence unless it meets one of the following three criteria:   (1) the sentence imposed is above the maximum penalty provided in the statute of conviction, (2) the Court, after determining the otherwise applicable sentencing guideline range, either departs or varies upwardly, or (3) the Court determines that the total offense level is higher than 30 and imposes a sentence above the sentencing guideline range calculated for that total offense level.   Except as provided above, the defendant also knowingly and voluntarily waives the right to appeal the manner in which the sentence is determined on grounds set forth in 18 U.S.C. § 3742.   The defendant also knowingly

2

and voluntarily waives his right to challenge this prosecution, conviction, or sentence and/or the manner in which it was determined in any collateral attack, including but not limited to a motion brought under 28 U.S.C. § 2255. This waiver provision, however, will not prevent the defendant from seeking relief otherwise available if: (1) there is an explicitly retroactive change in the applicable guidelines or sentencing statute, (2) there is a claim that the defendant was denied the effective assistance of counsel, or (3) there is a claim of prosecutorial misconduct. Additionally, if the government appeals the sentence imposed by the Court, the defendant is released from this waiver provision.

*Government's Obligations*:

(1)   The U.S. Attorney's Office for the District of Colorado (the Government) agrees not to pursue any additional charges against the defendant based on conduct known to date to the U.S. Attorney's Office in Colorado.

(2)   The Government agrees at the time of sentencing to recommend a sentence within the guideline range as calculated by the parties.

(3)   The Government agrees that the projected offense level as set forth below in Part VI is the same position it will take at the time of sentencing as it relates to the various applicable guideline provisions.

A.    Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), whether in the possession or control of the United States or in the possession or control of the defendant or defendant's

3

nominees, or elsewhere.   The assets to be forfeited specifically include, but are not limited to: the proceeds obtained by the defendant's scheme.   The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, and/or administrative forfeiture action.   The defendant also hereby agrees that the forfeiture described herein is not excessive and, in any event, the defendant waives any constitutional claims that the defendant may have.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis to establish that the requisite nexus exists between the specific property subject to forfeiture and the offense to which defendant is pleading guilty.   Pursuant to the provisions of Rule 32.2(b)(1), the United States and the defendant request that at the time of accepting this plea agreement, the Court find that the government has established the requisite nexus and enter a preliminary order of forfeiture.

Defendant further agrees to take all steps necessary to locate the property and to pass title to the United States.   These steps include, but are not limited to; the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.   To that end, defendant agrees fully to assist the government in the recovery and return to the United States of any assets, or portions thereof, as described above wherever located.   The defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control and those which are held or controlled by a nominee.

The defendant agrees that the United States is not limited to forfeiture of the

property described above.   If the United States determines that property of the

defendant identified for forfeiture cannot be located upon the exercise of due diligence;

has been transferred or sold to, or deposited with, a third party; has been placed

beyond the jurisdiction of the Court; has been substantially diminished in value; or has

been commingled with other property which cannot be divided without difficulty; then the

United States shall be entitled to forfeiture of any other property (substitute assets) of

the defendant up to the value of any property described above pursuant to 21 U.S.C. §

853(p) and Federal Rules of Criminal Procedure 32.2(e).   This Court shall retain

jurisdiction to settle any disputes arising from application of this clause.   The defendant

agrees that forfeiture of substitute assets as authorized herein shall not be deemed an

alteration of the defendant's sentence.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any

fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon

the defendant in addition to forfeiture.   [The United States Attorney's Office for the

District of Colorado will recommend to the Attorney General that any net proceeds

derived from the sale of the judicially forfeited assets be remitted or restored to eligible

victims of the offense, for which the defendant has pleaded guilty, pursuant to 18 U.S.C.

§ 981(e), 28 C.F.R. pt. 9, and any other applicable laws.   The defendant understands

that the United States Attorney's Office has authority only to recommend such relief and

that the final decision of whether to grant relief rests solely with the Department of

Justice, which will make its decision in accordance with applicable law.]

## II.  ELEMENTS OF THE OFFENSE

5

The parties agree that the elements of the offense to which this plea is being

tendered, Mail Fraud, 18 U.S.C. § 1341, are as follows:

*First*: The defendant devised a scheme to defraud or to obtain money by means of false or fraudulent pretenses, representations, or promises;

*Second*: The defendant acted with specific intent to defraud or to obtain money by means of false or fraudulent pretenses, representations, or promises;

*Third*:   The defendant mailed, or caused another person to mail, something through the United States Postal Service for the purpose of carrying out the scheme; and

*Fourth:*   The scheme employed false or fraudulent pretenses, representations, or promises that were material.

Tenth Circuit Pattern Criminal Jury Instructions, 2011, § 2.56.

## III.   STATUTORY PENALTIES

The maximum statutory penalty for a violation of 18 U.S.C. § 1341 is: not more

than 20 years' imprisonment; a fine of NMT the greater of $250,000 or two times the

gain or loss from the offense, or both imprisonment and a fine; NMT 3 years' supervised

release; $100 special assessment; plus restitution.   If probation or supervised release

is imposed, a violation of any condition of probation or supervised release may result in

a separate prison sentence and additional supervision.


## IV.   COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including but not limited to the

rights to possess firearms, vote, hold elected office, and sit on a jury.

## V.   STIPULATION OF FACTS

6

The parties agree that there is a factual basis for the guilty plea that the defendant will tender pursuant to this plea agreement. That basis is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. §3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from hereafter presenting the Court with additional facts that do not contradict facts to which the parties have stipulated and which are relevant to the Court's guideline computations, to other 18 U.S.C. §3553 factors, or to the Court's overall sentencing decision.

The parties agree that the year in which relevant conduct began is 2001, and that conduct continued through and including July of 2018.

The parties agree as follows:

Between 2001 and the summer of 2018, the defendant was the President and sole owner of a company called Financial Visions, Inc. (FV).   FV's business model was based on taking assignments on life insurance policies in order to pay for funeral expenses.   When a family experienced the death of a family member and could not afford the funeral expenses, FV would pay the funeral home and/or cemetery for those expenses and take an assignment on the deceased's life insurance policy.   When the insurance company paid the life insurance proceeds, it would pay FV directly for the

7

funeral expenses that FV had fronted.   FV charged the family of the deceased a 4 to 5 percent fee for this service.

Individuals who decided to invest in FV received a one-page Promissory Note signed by the defendant as President of FV.   The Promissory Note contained the date, the investor's name, and the amount invested.   Through the Promissory Note, the defendant promised to pay back to the investor the principal amount invested plus interest.   Most investors were promised 12% simple interest per year on their principal amount invested, to be paid on a quarterly basis.   In addition to receiving interest payments on a quarterly basis, the investors were promised that the "entire principal balance plus any accrued interest can be called and deemed payable UPON 90 days written notice."

Between 2001 and the spring of 2018, approximately 200 individuals from across the country invested in FV.   Through his prior business dealings in the Denver metro area, the defendant earned a reputation as a successful businessman.   Through his associations, he acquired investors in FV.   As the defendant continued to pay the quarterly interest payments on a regular basis, his existing investors referred friends and family to the defendant so that they could invest in FV as well.   Investors often made additional investments or reinvested proceeds they received from FV with the defendant over the years.

The defendant continued to take in money from new investors, but the number of funeral homes using FV's services did not continue to grow at a commensurate rate. As a result, FV owed investors more and more in interest payments while FV was not

8

making a profit sufficient to sustain such payments.   Only one or two investors

requested financial information about FV from the defendant.   In response to at least

one investor, the defendant provided financial statements that he fabricated which did

not represent the true financial status of FV.

The defendant asserts that at the beginning, FV was a viable business with a

good business plan.   The key to his business was putting money out (*i.e.,* lending

money for funeral expenses) and bringing it back in *(i.e.,* receiving payment from life

insurance policies) as soon as possible.   He admits, however, that by the beginning of

2010, he began using later investors' funds to pay the interest payments due to the

earlier investors because there was insufficient business from funeral homes to fund

these payments.   The government asserts that, based on profit and loss statements,

FV was not a profitable business model from its inception.

Approximately once a year, the defendant sent through the United States mail or

via email a letter to FV investors claiming that the prior year had been FV's "best year

ever," and/or a "banner year," and claiming that numerous new funeral homes across

the country were now using FV's services.   In truth and in fact, FV was not adding

additional funeral homes and the business was not profitable.   In these letters, the

defendant also informed investors he was accepting additional investment dollars, while

at the time knowing that he was using additional funds invested to pay the interest

amounts promised to earlier investors.

Specifically, as alleged in Count One of the Information, in March of 2017, the

defendant mailed via the United States mail an investor letter to Investor M.B.   In this

letter, the defendant told Investor M.B. that "2016 was our best year ever and with the addition of 'new' funeral homes who are using our service across the country, I feel 2017 will continue to increase our opportunities and provide the returns that we are accustomed to receiving."   The defendant informed Investor M.B. that he was "still taking in investment dollars both short term (2% monthly) or long term (12% annual). Between the combination of growth dollars and people who need to redeem their capital, we continue to take in investment $$$."   In truth and in fact, by 2017, as the defendant well knew, all investments received by him were used to pay interest payments to prior investors and FV was doing business with very few funeral homes.[1] The false representations made in the letter mailed to Investor M.B. were material in that it led M.B. to believe that his principal investment was secure, that he would continue to receive interest payments, and lulled him into believing FV was legitimate so as to prevent or delay M.B. from reporting the defendant's conduct to law enforcement.[2]

In May of 2018, when Investor M.B. and other investors continued to question the delay in receipt of interest payments, the defendant advised that he had negotiated a cash sale of FV and that once the sale went through each investor would be receiving their principal and interest through May 25, 2018.   In truth and in fact, there were no negotiations for the sale of FV and the defendant engaged in these lulling activities to buy more time to decide how to handle the situation and to prevent the investors from

---

[1] In fact, at this time the defendant was borrowing money from cash advance companies to make the interest payments.
[2] The defendant made such false representations to all of the approximately 200 investors in FV.

reporting his actions to the authorities.

Ultimately, certain investors did report the defendant to state and federal authorities.   On July 9, 2018, the defendant sent an email to certain of his investors, entitled, "I Have Done Enough Damage for One Life Time."   In this email, the defendant admitted that "Financial Visions went from being a traditional business to a Ponzi on or about 2010 or 2011."   He also admitted that his "investments were criminal and typical of the Ponzi mentality."   The defendant admitted he used proceeds from the scheme for his living expenses and explained that while he lived comfortably, it was "far from lavish.   I lived in an apartment, had a used but nice car and belonged to a nice golf course.   I probably lived on $300,000 per year."

The defendant estimated the amount of outstanding loans as over $55 million. However, as the investigation later revealed, the defendant did not take into account the amount of "interest" paid to investors over the years.[3]   In this email, the defendant stated his intention to either commit suicide or turn himself in to law enforcement. However, prior to turning himself in, the defendant threw into a dumpster his computer and hard drive which contained a list of all investors, an accounting of all investment amounts he received, and interest payments he made.   He also threw into the dumpster almost all investor physical files.   This evidence was material to the investigation to determine the scope of the scheme and the restitution amounts due to the victims.   The defendant did turn over to the government the limited number of

_____

[3] As noted, the interest payments were actually principal amounts funded by later investors.

investor files he did not destroy and has cooperated with the government in its attempts to determine exactly how much money each investor lost in the scheme.

Taking into account money returned to investors in the form of "interest" payments, investors are currently owed approximately $20 million dollars.

## VI.    ADVISORY GUIDELINE COMPUTATION AND 3553 ADVISEMENT

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters that are in dispute.

A.    The base guideline is § 2B1.1(a)(1) with a base offense level of **7**.

B.    Specific Offense Characteristics:   Because the loss was more than $9,500,000, but less than $25,000,000, a **20**-level increase in offense level is applied. § 2B1.1(b)(1)(K).

C.    Victim Enhancement:   Because the offense resulted in substantial financial hardship to 5 or more victims, a **4**-level enhancement applies. § 2B1.1(b)(2)(B).

D.    Destruction of Evidence:   Because the defendant destroyed evidence (*i.e.*, his computer and hard drive that contained detailed investor files and physical

12

investor files upon learning that an official investigation was about to commence, which files were material to the investigation), a **2**-level enhancement applies.   § 3C1.1.   The defendant objects to the application of this enhancement.

E.     According to the government's calculations, the adjusted offense would be **33**.

F.     Provided the defendant does nothing inconsistent with accepting responsibility between the time he signs this plea agreement and the time of his sentencing hearing, the defendant should receive a reduction of **3** points for acceptance of responsibility pursuant to § 3E1.1(b). The resulting offense level, according to the government's calculations, would be **30**.

G.     The parties understand that the defendant's criminal history computation is tentative.   The criminal history category is determined by the Court based on the defendant's prior convictions.   Based on information currently available to the parties, it is estimated that the defendant's criminal history category would be I as the defendant has no known criminal history.

H.     The advisory guideline range resulting from the government's calculations is **97-121** months imprisonment.   However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the offense level(s) estimated above could conceivably result in a range from **97** months (bottom of Category I) to **210** months (top of Category VI).   The guideline range would not exceed, in any case, the cumulative statutory maximums applicable to the counts of conviction.

I.     Pursuant to guideline § 5E1.2, assuming the estimated offense level

13

above, the fine range for this offense would be $30,000 to $300,000 plus applicable interest and penalties.

      J.      Pursuant to guideline § 5D1.2, if the Court imposes a term of supervised release, that term is at least 1 years but not more than 3 years.

      K.      The defendant agrees to pay restitution to individuals identified and in an amount determined prior to sentencing.

      L.      The defendant agrees to the entry of preliminary and final orders of forfeiture.

The parties understand that although the Court will consider the parties' estimate, the Court must make its own determination of the guideline range. In doing so, the Court is not bound by the position of any party.

No estimate by the parties regarding the guideline range precludes either party from asking the Court, within the overall context of the guidelines, to depart from that range at sentencing if that party believes that a departure is specifically authorized by the guidelines or that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the United States Sentencing Commission in formulating the advisory guidelines. Similarly, no estimate by the parties regarding the guideline range precludes either party from asking the Court to vary entirely from the advisory guidelines and to impose a non-guideline sentence based on other 18 U.S.C. § 3553 factors.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it

deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII.   ENTIRE AGREEMENT

This document states the parties' entire agreement.   There are no other promises, agreements (or "side agreements"), terms, conditions, understandings, or assurances, express or implied.   In entering this agreement, neither the government nor the defendant has relied, or is relying, on any terms, promises, conditions, or assurances not expressly stated in this agreement.

Date: 12/7/18

Daniel B. Rudden
Defendant

Date: 12/7/18

Natalie Stricklin
Attorney for Defendant

Date: 12/7/18

Martha A. Paluch
Assistant U.S. Attorney

Date: 12/7/18

Rebecca S. Weber
Assistant U.S. Attorney

16