**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Criminal Case No. 18-cr-00508-CMA**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**1. DANIEL B. RUDDEN,**

**Defendant.**

---

## GOVERNMENT'S SENTENCING STATEMENT

---

The United States of America respectfully submits the following Sentencing Statement. The defendant faces a guidelines range of 97-121 months.[1] Probation recommends 120 months. *See* Presentence Investigation Report ("PSIR") at Ex. A. The government requests a high-end sentence of **121 months**.

**I.  Nature and Circumstances of the Offense**

*A. Overview*

The defendant pled guilty to one count of Mail Fraud, in violation of 18 U.S.C. § 1341.[2] Over the course of several years, the defendant ran a Ponzi scheme that ended

---

[1] The defendant contests the imposition of a 2-level enhancement for Obstruction of Justice pursuant to §3C1.1 (ECF No. 44). Excluding that enhancement would result in a guidelines range of 78-97 months.

[2] Charging additional counts of mail fraud in connection with the defendant's scheme to defraud would have resulted in the same advisory sentencing guidelines range of 97-121 months because those additional counts would group. The guidelines range is based on the loss figures for the overall scheme to defraud, not on the number of counts of conviction.

up costing over 175 investors approximately $ 19 million.   More than 65 victims lost more than $100,000 each, and a few victims lost over $1 million.[3]

The defendant was the President and sole owner of a company called Financial Visions, Inc. (FV). FV's business model was based on taking assignments on life insurance policies in order to pay for funeral expenses.  When a family experienced the death of a family member and could not afford the funeral expenses, FV would pay the funeral home and/or cemetery for those expenses and take an assignment on the deceased's life insurance policy.  When the insurance company paid the life insurance proceeds, it would pay FV directly for the funeral expenses that FV had fronted. FV charged the family of the deceased a 4 to 5 percent fee for this service.

Individuals who decided to invest in FV received a Promissory Note signed by the defendant.  Through the Promissory Note, the defendant promised to pay back to the investor the principal amount invested plus interest.  Most investors were promised 12% simple interest per year on their principal amount invested, to be paid on a quarterly basis.

Over the years, the defendant continued to take in money from new investors, but the number of funeral homes using FV's services did not continue to grow at a commensurate rate.  As a result, FV owed investors more and more in interest payments while FV was not making a profit sufficient to sustain such payments.  The defendant began using later investors' funds to make the interest payments to earlier investors.

The defendant sent an annual letter to FV investors proclaiming FV's success and

---

[3] While approximately 200 individuals from across the country invested in FV, the government has identified approximately 175 investors who lost money in the scheme, as described below.

describing the new funeral homes FV had added to its roster. In truth, FV was not adding funeral homes and the business was far from profitable. In these letters to investors, the defendant also explained that he was accepting additional investment money, even when he knew he was operating a Ponzi scheme.

The scheme came to a head when the defendant stopped being able to pay out "interest" and could not give investors a refund of their principal balance when they demanded it. Some investors reported the defendant to state and federal authorities. On July 9, 2018, the defendant emailed his investors and claimed that FV had become a Ponzi scheme by 2010 or 2011. As stated in the plea agreement, the government maintains that, based on profit and loss statements, FV was not a profitable business model from its inception.

In a July 14, 2018 interview with the FBI, the defendant stated that several weeks before the interview, he had thrown his computer and almost all of the investor files into a dumpster. The defendant has met with the government since he confessed, in an attempt to assist the government in reconstructing the loss to investors.

*Harm*

Numerous victims suffered substantial financial hardship as a result of the scheme. The PSIR identified 11 such victims, which supports the 4-level enhancement to the defendant's sentence pursuant to § 2B1.1(b)(2)(B). PSIR at 7-8, ¶¶ 29–39. Many had invested the bulk of their life savings with the defendant, and lived entirely off the quarterly "interest payments" from FV, plus social security or disability payments. Numerous investors are elderly and have no other means of earning income. While they placed

their trust in the defendant, the defendant took their money knowing that he was operating a Ponzi scheme – conduct that took place by his account over *seven years* and caused an enormous loss of *$19 million*. A $19 million loss for approximately 175 victims is a reflection of how much each individual victim suffered, and also of how much trust victims placed in the defendant when they gave him such large sums of money. The victim impact statements detail the depression and shock victims experienced after learning about the defendant's actions. This conduct warrants a high-end sentence.

B. *Loss Calculation Methodology*

The government calculated loss by taking the principal amount investors paid to the defendant and subtracting any "interest payments" the investor received from the defendant. Because this was a Ponzi scheme, the "interest payments" consisted of other victims' money. The U.S. Sentencing Guidelines are clear that loss "shall be reduced" by "money returned . . . by the defendant . . . to the victim before the offense was detected." § 2B1.1 app. n. 3(E)(i). In addition, the Guidelines provide that in a Ponzi scheme, "the gain to an individual investor in the scheme shall not be used to offset the loss to another individual investor in the scheme." § 2B1.1 app. n. 3(E)(iv).

Applying these principles, the government engaged in an extensive financial analysis to determine the loss in this case. Specifically, the FBI dedicated five financial analysts to work full-time on this project. Senior financial analysts from the U.S. Attorney's Office and the Colorado Attorney General's office analyzed records, as well. These analysts devoted over eight weeks to calculating the loss in this case. Because the defendant destroyed his computer and most other records, they used bank records,

the few dozen files recovered from the defendant, and documents from victims to reconstruct what each victim lost in the defendant's scheme. Bank records were available from April 2011 on, but some investments in the defendant's scheme occurred prior to that year.

Where analysts recovered a promissory note and had all bank records for the relevant timeframe, they were able to identify the principal balance the investor paid and all "interest payments" the investor received. For others, the government had to reconstruct the likely principal balance based on bank records showing monthly or quarterly payments.

The government attempted to contact all investors in order to request documents and to notify the investors of the loss calculations the government had reached. Some investors provided additional documentation or clarification on the numbers. Many victims have contested the methodology for calculating the loss. Still others did not respond to the government's requests for documentation.

Although the government's loss calculations are consistent with the U.S. Sentencing Guidelines, the government well understands why many victims argue that their loss should not be reduced by "interest payments" they received. Victims believed that their principal investment was safe and sound with the defendant and available to them at any point if they requested the return of that principal. The revelation that this was a Ponzi scheme meant not only that the quarterly interest payments on which many victims relied would come to an end, but also that their principal no longer existed. The financial and psychological harm of these actions is apparent from victim impact

statements and provides ample justification for a 121-month sentence.

## II.     History and Characteristics of the Defendant

The defendant has apparently led a happy and privileged life. For many years, he lived in an 8,000-square foot house with his six children and was generous to those around him. It appears that he had a gambling problem, which likely provided incentive for his fraudulent conduct. And it must be noted that for many years, the defendant's gambling problem was funded by the FV investors. In addition, in his plea agreement, the defendant admitted he used proceeds from the scheme for his living expenses and explained that while he lived comfortably, it was "far from lavish. I lived in an apartment, had a used but nice car and belonged to a nice golf course. I probably lived on $300,000 per year." While the defendant believes that living on $300,000 per year was "far from lavish," many of his investors, who are now struggling to pay their living expenses, would beg to differ. By the defendant's account, FV investors were funding the defendant's lifestyle, to include his gambling and golf, for over seven years.

It also appears that the defendant enjoyed his role as a pillar of the community. That role, at least as of several years ago, was premised entirely on a lie. Unlike many defendants who have experienced every disadvantage and setback in life, this defendant has had every advantage, yet he still committed this crime. This weighs in favor of a high-end sentence.

## III.    Other 18 U.S.C. § 3553(a) Factors

A 121-month sentence is warranted in this case to reflect the seriousness of this offense, to promote respect for the law, and to provide just punishment for the harm the

defendant caused to so many.  In addition, the defendant has a long history of soliciting and managing investments.  It has been his livelihood for decades.  Given how much money he stole in this scheme, the ease with which he was able to do it, and the number of years over which the theft occurred, specific deterrence and protection of the public from further crimes by this defendant are also concerns.  A lengthy sentence would address these concerns, particularly in light of the defendant's age.  A 121-month sentence would also serve a general deterrence purpose, sending a clear signal to other would-be fraudsters that there are extremely serious consequences to perpetrating "white collar" crime.  As discussed above, a 121-month sentence would also reflect the seriousness of this offense and provide just punishment.

### IV.    Conclusion

For these reasons, at the June 20, 2019 sentencing hearing, the government will respectfully request that the Court impose a sentence of 121 months in prison, followed by three years of supervised release, and that the defendant be ordered to pay a $100 special assessment, and approximately $19.5 million in restitution to the victims.[4]

---

[4] While the PSIR contains a specific amount of restitution due, the government is reviewing loss amounts for certain victims in response to their submissions to the probation office.   The government will file a pleading with the amended loss amount prior to sentencing.

Respectfully submitted this 6th day of June, 2019.

        JASON R. DUNN
        UNITED STATES ATTORNEY

        By: s/ Martha Paluch
        MARTHA PALUCH
        s/ Rebecca S. Weber
        REBECCA S. WEBER
        Assistant U.S. Attorneys
        U.S. Attorney's Office
        1801 California St., Suite 1600
        Denver, CO   80202
        Telephone:   (303) 454-0100
        Fax:   (303) 454-0403
        E-mail: Martha.Paluch@usdoj.gov
        Rebecca.Weber@usdoj.gov
        Attorneys for Government

## CERTIFICATE OF SERVICE

    I hereby certify that on June 6, 2019, I electronically filed the foregoing **GOVERNMENT'S SENTENCING STATEMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties of record.

> By: s/ Martha A. Paluch
> MARTHA A. PALUCH
> Assistant U.S. Attorney
> U.S. Attorney's Office
> 1801 California St., Suite 1600
> Denver, CO   80202
> Telephone:   (303) 454-0100
> Fax:   (303) 454-0403
> E-mail: Martha.paluch@usdoj.gov
> Attorney for Government