**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

CASE NO. 18-CR-00508-CMA

UNITED STATES OF AMERICA,

   Plaintiff,

v.

DANIEL B. RUDDEN,

    Defendant

---

## DEFENDANT'S MOTION FOR VARIANT SENTENCE

---

  Defendant Daniel Rudden, by and through counsel, Colette Tvedt, and pursuant to Title 18 U.S.C. Section 3553(a), respectfully moves this Court to impose a variant sentence of 5 years incarceration, and 3 years supervised release. In support of said Motion, Defendant Rudden states as follows:

## I. Introduction:

  On December 7, 2018, Daniel Rudden waived the right to indictment and pled guilty to a one-count information, charging the offense of Mail Fraud, in violation of 18 U.S.C. § 1341. The facts underlying the offense are set forth in detail in both the Plea Agreement (Doc. 33) and the PSR. Mr. Rudden has agreed that for purposes of the sentencing guidelines, the loss amount is between $9,500,000 and $25,000,000. Mr. Rudden agreed to the Sentencing Guidelines calculation as stated in the Plea Agreement and the PSR except for the 2-level enhancement of Obstruction of Justice pursuant to §

3C1.1 for throwing away his computer, hard drive and some investor files. See, the Defendant's Objections to the PSR, Document 44.

Mr. Rudden agreed to pay restitution and to forfeit any and all assets and property, pursuant to 18 U.SC. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

The Plea Agreement further reflects the fact that either party may present the Court with additional facts which do not contradict facts to which the parties have stipulated, and which are relevant to the court's guideline computations, or to sentencing in general. (Doc. 33 at pp. 7).

For the reasons set forth below, Defendant Rudden respectfully requests this Court to impose a sentence of 5 years' incarceration and 3 years supervised release.

## II.     The Applicable Sentencing Standard:

Defendant recognizes that a sentence below the advisory guidelines range, whether predicated upon a 5K1.1 motion, application of the factors enumerated in Title 18, U.S.C., Section 3553(a), or both, constitutes a "variant sentence." A "variant" sentence results when "a court enhances or detracts from the recommended [Guidelines] range through application of § 3553(a) factors." United States v. Atencio, 476 F.3d 1099, 1101 n.1 (10th Cir. 2007), overruled in part on other grounds by Irizarry v. United States, 533 U.S. 708 (2008).

Following United States v. Booker, 125 S.Ct. 738 (2005), a sentencing court must impose a sentence in accordance with Title 18 U.S.C. Section 3553(a) and should no longer presume a sentence calculated pursuant to the Sentencing Guidelines is appropriate. In the post-Booker world, the correctly calculated Guidelines range is but one factor for the Court to consider in imposing a sentence. Most significantly, the Court

2

must impose a sentence "sufficient, but not greater than necessary" to comply with the purposes of punishment set forth in Title 18 U.S.C. 3553(a)(2). *See* United States v. Foreman, 436 F.3d 638, 644 n. 1 (6th Cir. 2006) ("the district court's job is not to impose a 'reasonable' sentence [but] to impose 'a sentence sufficient, but not greater than necessary, to comply with the purposes' of section 3553(a)(2)"); United States v. Tucker, 473 F.3d 556, 561 (4th Cir. 2007) (same); United States v. Willis, 479 F.Supp.2d 927, 929 (E.D. Wis. 2007) (explaining that "the so-called parsimony provision…directs the court to impose the minimum term necessary to comply with the statutory goals of sentencing").  Those purposes include the need "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; "to afford adequate deterrence to criminal conduct"; and "to protect the public from further crimes of the defendant." Title 18 U.S.C. 3553(a)(2)(A), (B) and (C).

To the extent that Defendant is effectively arguing for a variant sentence, such an argument allows a sentencing court not only to consider the so-called Section 3553(a) factors, but also factors that may be disfavored by the Sentencing Guidelines, like age and criminal record (even for defendants who already are in criminal history Category I). United States v. Huckins, 529 F.3d 1312, 1318-19 (10th Cir. 2008) (citing United States v. Munoz-Nava, 524 F.3d 1137, 1148 & n. 6 (10th Cir. 2008); Gall v. United States, 552 U.S. 38, 128 S.Ct. 586, 602 (2007), and Kimbrough v. United States, 552 U.S. 85, 128 S.Ct. 558, 575 (2007)).

In addition to the presumptive guidelines range, sentencing courts must also consider, pursuant to Title 18 U.S.C. 3553(a), a number of other factors, including "the nature and circumstances of the offense and the history and characteristics of the

defendant"; "the kinds of sentences available"; and the Guidelines. *Id.* at 3553(a)(1), (3) and (4).  Under this sentencing regime, a court should consider all the relevant sentencing factors, giving no more weight to one factor than to any other factor.  The focus of the post-Booker sentencing scheme, therefore, is a sentence based on the whole person before the court, rather than upon a mechanistic application of oftentimes two-dimensional and limited sentencing factors as embodied and codified in the Guidelines.

In the present case, as set forth more fully below, Defendant Rudden avers that certain facts and circumstances warrant a five year sentence and that the grounds for such a sentence are well supported.  In addition, Defendant Rudden respectfully submits that full consideration of all the factors outlined in Section 3553(a), including the fundamental precept that the sentence be sufficient, but not greater than necessary to serve the purposes of punishment, makes clear that a sentence of no more than 5 years of incarceration is warranted here.

**III.   Application and Analysis Pursuant to Title 18 U.S.C. § 3553:**

**A.   The History and Characteristics of Daniel Rudden:**

**Early Family Life:**

Pursuant to Title 18 U.S.C. 3552(a)(1), the Court must consider the Defendant's "history and characteristics" in fashioning an appropriate sentence. Mr. Rudden has expressed sincere and profound remorse for his actions and has cooperated with the United States government in their investigation since the beginning of this case. See, Mr. Rudden's Statement to the Court., Exhibit A.

Mr. Rudden is 72 years old. He was born to Bernard and Katherine Rudden in New York City on October 30, 1946. Bernard Rudden was in the Air Force and fought in World

4

War II as a "tail gunner" in a plane. He was seriously injured during the war resulting in the amputation of his left leg. He was Honorably Discharged as a Corporal in the Air Force. When he returned to New York, he became an engineer at Martin Marietta.[1]

Mr. Rudden came from a modest background and worked very hard to succeed. He grew up in a large Catholic family in Denver. He had a very happy childhood. He is the oldest of five children. His brother Jerry Rudden is 70 years old and lives in Boulder, CO and is a retired executive from IBM. Jerry was diagnosed with polio at the age of 6 and has long been considered one of Daniel's heroes. Mr. Rudden's family moved to Colorado when Mr. Rudden was young, for Jerry to be treated at Spears Hospital. Although there was no cure for Jerry, the family remained in Colorado. Mr. Rudden's brother Tim, is 65 years old and lives in Longmont, CO and works for Denver International Airport. His sister Maryanne O'Toole lives in Centennial, CO is a real estate agent and his sister, Eileen, is 55 years old and lives in Littleton, CO.

When Daniel was 23 years old, his 51-year-old father was diagnosed with cancer and tragically died a few months later, leaving his 50 year old wife, widowed with young children. Peggy was a stay at home mother and Daniel Rudden quickly jumped into the role of father figure and financial supporter for his mother and for his younger siblings while supporting his own young family. He had been raised with a very strong work ethic and his parents instilled in him a "don't quit" work ethic and taught him that failure could be overcome by working harder. He knew that he would be tasked with raising his

---

[1] Martin Marietta Inc. is an American-based company and a member of the S&P 500 Index. The company is a supplier of aggregates and heavy building materials, with operations spanning 26 states, Canada and the Caribbean. Martin Marietta supplies the resources for roads, sidewalks and foundations.

children, while continuing to help raise his younger brothers and sisters, a job he undertook with pride. As his sister Maryanne O'Toole writes in her letter to the Court:

> "Most of Dan's life has been defined by being the person many people have depended on and leaned on. In our youth he was more like a father to my sister and I, since our father passed away from cancer when I was 13 and Eileen was 5. Dan was a 24-year-old, young, married dad of 2 babies when our father died, and he quickly jumped in to help my mother with all the difficult tasks and decisions to be made during her grief. Danny had graduated from college and started a new job in Houston, Texas. When our dad died, he immediately moved his family back to Denver to help our mom and family. He sacrificed a lot to help our mom financially and stepped into a father role for my sister and I. He was always a rock, never wanting to let anyone down. He continued that role throughout our lives…taking us on family vacations, walked us down the aisle at our weddings; helped us with down payments on our first homes; coached our sports teams; helped put us through college…he was a constant encourager and caretaker."

See, Exhibit B-1, letter from Maryanne O'Toole.

While the death of his father was a tragedy for the family, as seen in the letters to the Court, the Rudden family drew closer together and they remain a very tight knit family to this day. Even after Daniel was arrested, the family has continued to support him.

**Mr. Rudden's Marriage and Family Life:**

Mr. Rudden met his wife, Marjorie "Peggy" Stapp when he was a freshman in high school. They immediately fell in love and dated throughout high school and college. They got married in 1969. They have six children: Tammy Kay, DOB 7/3/69, age 49 she has four children, and she lost her beloved daughter Gabby in September 2004 at the age of six after a 19 month battle with brain tumor, her legacy lives on through the Gabby Kraus Foundation[2], See, https://bagsoffun.org/about-us/;  Daniel Bernard Jr., DOB 9/30/70 age

---

[2] The Gabby Krause Foundation was started because of Gabby's special wish. The signature project, Bags of Fun, was created in the spirit of Gabby's original bag of toys and fun activities that kept her happy during hours of chemotherapy and treatment. The Bags of Fun program is a journey that began in 2004 when Gabby's mother needed to help her focus on the joy of being a little girl and playing with My Little Pony dolls instead of needle pokes. This journey has grown into a movement to harness the power of

47, lives in Phoenix with his wife and two children; Casey Mahn, DOB 12/23/74, 44 years old, lives in Centennial with her husband and four children; Kevin Foster, DOB 11/14/76, age 42, lives in San Diego with his wife and 4 children; Nicholas Christopher, DOB 4/7/82, age 36, lives in Cherry Hills, Greenwood Village with his four children and Thomas Michael, DOB 5/30/84, age 34 who lives in San Diego with his wife and one child. Dan and Peggy Rudden provided a very happy home which was always teaming with lots of children and their friends. Their house on Sedgewick Drive in Englewood was "the meeting place" for all the neighborhood children. Mr. Rudden was very involved with his children's activities and school events. He coached his children in many sports. He was the coach for his two daughter's basketball teams, and he coached his sons in football, basketball and baseball. His children all describe him as a loving and supportive father who raised them with a strong work, family and moral compass. As his daughter Tammy Krause states in her letter to the Court:

> "I am Daniel's oldest daughter and the oldest of his six children. While I am deeply saddened by his actions, I do feel that there is another side to my Father that I would like to share with you. Growing up as the oldest daughter, I have seen many sides of my father. He was a businessman, a coach, a mentor, an athlete and a great father. One of my favorite memories of my dad was when he would drive us to school in the mornings. He would play his favorite country music, or we would play the smile game. My dad made sure mornings were positive and would tell us we could make our days as great as we wanted. I also have memories of him coaching us whether it was baseball or basketball and him always being supportive of all our teams. I have many friends who still talk about playing for "Mr. Rudden". As a coach, my Dad was fair but tough and always insisted we do our very best. Through the many years he coached, my Dad also looked out for kids who did not have the same support we did. He would pay team fees, pick up kids for practice and make sure everyone was treated fairly, regardless of their resources. Part of understanding my father was also getting to know him as a young adult and seeing him as a grandfather. I will never forget how excited he was when his oldest granddaughter, my daughter Madison, was born… the pure joy on his face was an

---

play to instigate happiness when the thought of sickness and dying is at the forefront of families' hearts and heads.

incredible thing to witness. As the years have gone by there were more grandkids and more joy. I have two siblings with special needs children and my Dad is incredible with their unique needs. He loves to go to the kid's games and activities and brings that positive outlook to all 19 grandchildren. Even when life was at its hardest for me during the 19 months, I watched my own daughter fight cancer and eventually pass away, my Dad would remind me to pray and have faith.

I hope this helps in some way to see the other side of my father as a kind and compassionate person. I do not believe he intentionally set out to defraud his friends and family out of millions of dollars. My Dad thought he could save the business himself and ended up making terrible choices that hurt many people. I know from his own words he would do anything to have the chance to make up to the people he hurt so deeply. Please know that he was a good father and a good role model for most of his life.

See, Tammy Rudden Krause, Letter to the Court, Exhibit B-2.

Mr. Rudden has remained active in local community sports and had been the Treasurer for the Cherry Creek High School baseball teams, the Cherry Creek Diamond Baseball Club, and the Cherry Creek Bruins from 1989 until recently. He made lifelong friends as a coach and the Rudden house was a house full of love and laughter. Dan and Peggy got divorced in 1997 but remain close friends and confidants to this day. As Peg Rudden states in her letter to the Court, Dan has always been a very loyal family man. He raised his siblings after his father's death. He supported his mother and he supported Peg when she returned to school and then began her own non-profit organization, Arapahoe Advocates for Children.[3] Dan has always supported Peg in her personal and professional life, even after the divorce. As Peg Rudden states in her letter to the Court:

"In addition to supporting his biological family Dan and I have six children. He coached all of his children and helped many of their friends who came to him with family problems. Some of those adult children continue to reach out to him with thanks and conversation. We have been divorced for 20 years yet he always supported the children and me as I worked in the nonprofit world."

---

[3] This organization provides Court Appointed Special Advocates (CASAs) who are trained volunteers from the community who speak up for the best interests of children in the courtroom. Children helped by CASA volunteers include those for whom home placement is being determined in the Dependency and Neglect Court filings. Most of the children are victims of abuse and neglect.

See, Peg Rudden's Letter to the Court, Exhibit B-3.

**Education:**

Mr. Rudden's father always believed that a good education was critical for all of his children and worked two jobs in order to send his children to good schools. Mr. Rudden attended Christ the King, elementary school and then was accepted into Regis Jesuit High School.  Daniel was a natural athlete and played on the Regis basketball and baseball teams. He attended Regis College for 2 ½ years and then transferred to St. Mary's of the Plains College in Kansas. He was the quarterback of the St. Mary's football team and he graduated in 1969 with a degree in Business Administration and minor degrees in English and Math.

**Employment:**

While at St. Mary's, Mr. Rudden met Coach Matt May one of the most influential men in his life. Coach May took Daniel under his wing and mentored him throughout college. Coach May introduced Mr. Rudden to his brother-in-law, Ernie Talley, who was a successful businessman who ran several rent-to-own businesses. Mr. Rudden was hired by Mr. Talley to work for his business and within a few years, Mr. Rudden was his top performing employee. In 1973, Mr. Rudden started his own business, ABC TV Rental. His business quickly grew to 20 stores and he had stores in Connecticut, Rhode Island, Wisconsin, Colorado and California.

In 1980 Mr. Rudden and Willie Talley, Ernie Talley's brother who was also in the Rent-to-Own industry, decided to join forces and start a new company called ColorTyme, a rent-to-own company for furniture, electronics, and appliances. Over the next decade

the business continued to grow from 20 to 50 stores. During this time, Mr. Rudden mentored several employees that became independently successful under his tutelage. DC Webb was one of his early protégés and speaks very highly of Dan Rudden. Mr. Webb met Dan Rudden in 1986.  As Mr. Webb states in his letter to the Court:

> "He took me under his wing to teach me the Rent to Own business. I worked for him for several years, helping grow his business. Dan gave me so many opportunities... He taught me about customer relation services, how to manage the finances of the operation, how to manage employees, and how to market the business. In 1991 Dan helped me buy my first two stores…and over the years Dan helped me fulfill many of the items on my bucket list…Dan is one of the most important people in my life."

See, Letter from DC Webb to the Court, Exhibit B-4.

Another protégé of Mr. Rudden's was Pastor Samuel Fenceroy, whom Mr. Rudden hired to manage one of his stores in 1971 and Mr. Rudden supported his professional growth over the years. As Pastor Fenceroy wrote in his letter to the Court:

> My name is Samuel Louis Fenceroy, D.Div., the senior pastor of Mt. Olive Church of Plano (MOCOP) in Plano, Texas. I have served as the senior pastor of MOCOP for twenty-four years. I have known Daniel Rudden since 1971. He hired me to serve as his area manager at Mr. T's T.V. Rental in Denver, Colorado. Daniel Rudden and I worked closely with each other for over two years. In 1973, he made me an offer to move to Dallas, Texas, to purchase a rental store called ABC Rental. About two years later, he made me an offer to acquire 100% of the store. Afterwards, Daniel Rudden moved back to Denver to open a ColorTyme Rental store.

> The Denver newspaper referred to a pastor that Daniel Rudden confided in about this situation. Well, I am that pastor. Therefore, I understand the trouble that Daniel Rudden is in. He called me for advice when making his decision about what to do. He knows that what he did was wrong. Daniel Rudden has always been a hero of mine because of his honesty and fairness. He was, and still is, one of the greatest men I know. Though this is a terrible thing he has done, he has done some great things in his life also. In the 1970s, he treated me, an African American, with all fairness and with the utmost respect. Our agreement regarding the rental store was merely a "handshake" deal. There was nothing in writing. He was a man of integrity and worked hard to help people, not hurt them. In fact, his decision to face this situation was because of his love for other people. Daniel Rudden understands

that his actions were wrong, and he is deeply sorrowful. My prayers go out to all the people who have been affected by this ~~horrific mistake~~ crime.

See, Pastor Samuel L. Fenceroy's Letter to the Court, Exhibit B-5.

As evidenced by the support letters written to the Court, See, Exhibits B 1- 15, Mr. Rudden continues to have the love and support of many family, friends and former colleagues.

**The Nature and Circumstances of the Offense:**

Under Title 18, Section 3553(a)(1), the Court must also analyze the "nature and circumstances" of the convicted offense.  Mr. Rudden makes no excuses for his criminal conduct, and in no way attempts to minimize his actions.

This case is in many ways a story about Daniel Rudden's pride rather than greed. Mr. Rudden established and ran Financial Visions, not with the intent to steal from or defraud his clients, but rather with the intent to make money for them by achieving positive returns on their investments. Mr. Rudden had great confidence in his ability to run a successful and productive company with tremendous yields; unfortunately, that confidence was, at many times, misplaced and ultimately led to his demise.

**History of Financial Visions:**

In 2000, Dan Rudden met a man named Alex Schatz who was interested in starting a funeral funding business in Florida. Mr. Schatz was in very poor health and wanted his company idea to survive him and was interested in Dan Rudden taking over this business idea. Mr. Schatz died shortly after this meeting and Mr. Rudden began calling funeral homes and Financial Visions, Inc. began funding funeral homes in February 2001. The company began small with Mr. Rudden and one employee. Funeral Homes were FV's

customers and they would refer families who were in need (just lost a loved one) of receiving funds to pay for a funeral. An average funeral cost approximately $10,000. As FV gained more funeral homes, the company needed more capital. Since the funeral assignments were collateralized by life insurance policies, it was an attractive model to help raise capital. The initial five investors were paid 15% annual interest on their principle and subsequent investors were paid 12% annual interest. In the first ten years, the business grew steadily, the group of funeral homes grew from 100 to several hundred, investors continued to invest and re-invest their money with FV and several investors referred other friends and family members to invest in FV.

Starting in 2011, the funeral industry had become saturated with similar type businesses and FV was not able to support the payment of the interest to the investors. FV was not profitable and Mr. Rudden started using funds from investors and other investments in order to pay the annual interest payments to the FV investors. However, even as the FV business declined, FV was still getting new investment referrals and re-investments from existing investors. Mr. Rudden was not turning them away and he was reporting to his investors that the company was still profitable. Unfortunately, rather than admit the financial collapse of FV and communicate his losses to his victims, Mr. Rudden misrepresented the financial vitality of FV. Having made the initial decision not to honestly report his failures to his investors, Mr. Rudden quickly became mired in a downward spiral that lead to horrendous consequences.

Mr. Rudden succeeded in not only deceiving his investors, but also his family, and perhaps most astonishingly, himself. When the funeral industry dried up, he was relying on new investment money and profits from other investments to pay the 12% annual

interest payments to his investors. Mr. Rudden continued to take in new investor money with the optimistic yet ultimately impossible belief that these investments would help him make back his losses and get him and his investor clients back to even. Mr. Rudden's dissonance is perhaps best reflected by the fact that he used his money to pay investors and at the end, he was left with virtually no savings. While this fact does not diminish his wrongdoing, it does reflect his mindset that ultimately, he could make things right by continuing to misrepresent the viability of FV and continuing to take in investor money. Mr. Rudden tied a lot of his identity to his job. He relished being considered a very successful businessman running a blue-chip company while being a very loving father and grandfather. To the outside world he had "it all" and he had the ultimate confidence in his ability to pull this off. Mr. Rudden's pathological hope and denial are not inconsistent with the values he was taught and internalized during his childhood. The source of his guilt, shame and remorse is that his behavior is inconsistent with his conscience and values.

As has been widely reported by the media, Mr. Rudden's deception came to an end when on July 9, 2018 he sent an email to his investors and confessed his fraudulent scheme. In his email he acknowledged that he had made the conscious decision to keep taking money to keep interest payments current at a time he knew the company was no longer financially viable. He called his actions horrendous, in-defensible, devastating…he knew that he had betrayed the trust of everyone in his life. He told his investors that he would take his life or turn himself in to the authorities. Mr. Rudden did not commit suicide, although he realized that in not doing so, he would finally be required to confront his

deceptions, failures and the humiliation attendant to the public reporting and prosecution of his scheme.

**Mr. Rudden's Cooperation with the FBI, SEC and United States Attorney's Office:**

Mr. Rudden began the process of accepting responsibility for his actions, and in living with and expressing his remorse, from the moment he turned himself in. On July 17, 2018, Mr. Rudden spoke to FBI Special Agent Travis L. Wall and agreed to meet with him and fully cooperate in the investigation. On July 18, 2018, FBI Special Agents Travis Wall and Sarah Anderson met with Mr. Rudden at the Financial Visions Office located at 5460 South Quebec Street, Greenwood Village, CO. He waived his right to counsel and fully cooperated with the FBI agents. He provided the Government with investor files, check carbons, FV note, records, bank records, a list of companies that were investors, and emails.

He met with SA's Wall and Anderson again on July 19, 2018 at his apartment located at 5200 South Ulster Street, Greenwood Village.  Again, he waived his right to counsel, and he explained in detail the facts surrounding his fraudulent scheme. He provided the Agents with a copy of a sample promissory note that was given to each investor. At the conclusion of this meeting he agreed to continue working with law enforcement to help with the investigation and gathering of evidence.

On August 30, 2018, Mr. Rudden, accompanied by his then lawyer, Federal Public Defender, Natalie Stricklin, met with Assistant United States Attorneys Martha Paluch and Rebecca Weber, and FBI Agent Wall at the United States Attorney's Office. Mr. Rudden provided more details about how he structured FV, he provided investor emails. He was shown letters he sent to investors and verified that they were sent between 2012 and

2017. He provided information on specific investors. He admitted that he had not been truthful with many of his investors about the viability of FV. He answered questions and provided information about his bank accounts.

Over the months that this case has been pending, Mr. Rudden has continued to meet with special agents from the FBI; SEC officers; and with Assistant United States Attorney Paluch and federal accountants to answer questions about the case; review spread sheets of investors and calculated loss amounts; and review and answer questions about newly discovered evidence. He has been consistently cooperative, responsive and polite throughout the investigation.

**IV. The Need for Just Punishment, to Protect the Public, and Promote Respect for the Law:**

We are asking the Court to sentence Mr. Rudden to 5 years of incarceration. A lengthier prison sentence would not serve the ends of justice. To that end, a greater federal prison sentence is unnecessary for Mr. Rudden to "get the message" that he must heretofore abide by and obey the laws of this country. Prior to his arrest in this case he had lived a crime free life for decades. He has demonstrated that he can live a productive and crime free life. While on pretrial release, he has lived a frugal life, working for Uber and living on a small monthly stipend. At the time of sentencing, Mr. Rudden will be 72 years old and he will remain under the strict scrutiny of the justice system for many years. He is unlikely to re-offend and a lengthy prison sentence will not serve the purpose of deterring others.

Even the Department of Justice has found that sending criminals to prison is not an effective tool for general deterrence.   See *Five Things About Deterrence,* U.S.

Department of Justice, Office of Justice Programs, National Institute of Justice, http://www.nij.gov/five-things/pages/deterrence.aspx. A study by the Arnold Foundation found that low and moderate risk defendants who spend even short periods behind bars were more likely to recidivate. http://www.arnoldfoundation.org/wp-content/uploads/2014/02/LJAF-Pretrial-CJ-Research-brief_FNL.pdf. And in the article, *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science,* Francis Cullen, Cheryl Lero Johnson, and Daniel S. Nagin, Sage Publications 2011, the study found that historically, one of the major justifications for the rise of mass incarceration in the United States is that placing offenders behind bars reduces recidivism by teaching them that "crime does not pay." This rationale has been based on the view that custodial sanctions are uniquely painful and thus exact a higher cost than noncustodial sanctions. An alternative position, developed by criminologists, is that imprisonment is not simply a "cost" but also a social experience that deepens illegal involvement. Using an evidence-based approach, the authors concluded that there is little evidence that prisons reduce recidivism and at least some evidence to suggest that they have a criminogenic effect. The policy implications of this finding are significant, for it means that beyond crime saved through incapacitation, the use of custodial sanctions may have the unanticipated consequence of making society less safe. http://journals.sagepub.com/doi/abs/10.1177/0032885511415224?journalCode=tpjd

A recent study by Rhys Hester, et al., *Prior Record Enhancements at Sentencing: Unsettled Justifications and Unsettling Consequences*, 47 Crime & Just. 209 (2018) (available on Westlaw) found that punishment in the name of rehabilitation, special deterrence, general deterrence, incapacitation, and denunciation for offenders which all

share the same goal of reducing offending is not supported by evidence- especially for low level, first time offenders. If punishment strategy systemically fails to reduce the harm from crime from one of these or similar mechanisms, then the punishment is gratuitous and cannot be justified on consequentialist grounds. They found that for first time, low level offenders who will not benefit or do not need special treatment programs, prison does not rehabilitate and is often more punitive; longer prison sentences do not deter low level offenders; the costs of incapacitation of low level-low risk defendants mostly outweigh the benefits; any crime control benefits of denunciation are uncertain. Thus, despite these historical justifications for lengthy prison sentences, there is little empirical evidence to support justification of a lengthy sentence for a low risk defendant. Despite the intuitive appeal of these policies, it is difficult to justify them on retributive grounds. There is certainly no cohesive, prevailing retributive theory of aggravation that would justify the linear increases in sentences. Nor does rehabilitation or deterrence provide strong justification for these increases. The best current evidence suggests that, if anything, offenders become more likely to recidivate when exposed to more severe sanctions, not less. Some view incapacitation as a compelling policy when used selectively for a small subpopulation of violent and high-rate offenders, but incapacitation does not justify increasing the punishment of all offenders. 47 Crime & Just. 209, 237-38

**Aging Inmates in the Federal Bureau of Prisons:**

Mr. Rudden has no prior criminal history. He will be entering the BOP at the age of 72. In 2016, the Office of the Inspector General, U.S. Department of Justice, released the report, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*,

17

Evaluation and Inspections Division, Released February 2016. Report available at: https://oig.justice.gov/reports/2015/e1505.pdf. In its report, the OIG found that aging inmates are more costly to incarcerate than their younger counterparts due to increased medical needs. They further found that limited institution staff and inadequate staff training affect the BOP's ability to address the needs of aging inmates. The physical infrastructure of BOP institutions also limits the availability of appropriate housing for aging inmates. Further, the BOP does not provide programming opportunities designed specifically to meet the needs of aging inmates. OIG also determined that aging inmates engage in fewer misconduct incidents while incarcerated and have a lower rate of re-arrest once released; however, BOP policies limit the number of aging inmates who can be considered for early release and, as a result, few are released early.

The OIG found that the BOP's aging inmate population contributes to increases in incarceration costs. Aging inmates on average cost 8 percent more per inmate to incarcerate than inmates age 49 and younger (younger inmates). In FY 2013, the average aging inmate cost $24,538 to incarcerate, whereas the average younger inmate cost $22,676. OIG found that this cost differential is driven by increased medical needs, including the cost of medication, for aging inmates. BOP institutions with the highest percentages of aging inmates in their population spent five times more per inmate on medical care ($10,114) than institutions with the lowest percentage of aging inmates ($1,916). BOP institutions with the highest percentages of aging inmates also spent 14 times more per inmate on medication ($684) than institutions with the lowest percentage ($49). This matches the percentages in state prisons. According to a 2017 Pew Charitable Trusts report, On Prison Healthcare Costs and Quality,

http://www.pewtrusts.org/en/research-and-analysis/reports/2017/10/prison-health-care-costs-and-quality Colorado spent $6,641 per inmate on health care in 2015; which placed Colorado in the middle of the states for money spent on healthcare for inmates. The Pew report makes clear that healthcare costs vary drastically from state to state- institution to institution. It also notes, that while prison populations have slightly shrunk, the age of inmates has increased significantly. For example, in 2010, 7.1 % of Colorado's prison inmates were 55 or older. In 2015, that share had risen to 10.6 ranking Colorado 17th in the country for the largest percentage of prison inmate 55 or older. Sentencing Mr. Rudden to a lengthy prison sentence would be costly, would not impact deterrence; would not protect the public- since Mr. Rudden is a low risk individual and unlikely re-offend.

**V.      Conclusion:**

WHEREFORE, considering all the relevant factors enumerated by 18 U.S.C. §3553(a), Mr. Rudden respectfully requests that the Court impose a variant sentence of 5 years of incarceration and 3 years supervised release. Mr. Rudden requests permission to voluntarily surrender at the institution designated by the Bureau of Prisons before noon within 30 days of the date of designation.

Dated this 7th day of July 2019.

*s/ Colette Tvedt*
Colette Tvedt, #49751
Attorney for Defendant Daniel Rudden
1600 Stout Street, Suite 1400
Denver, CO 80202
(303) 577-1633
(303) 446-9400 (fax)
colette@tvedtlaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of June 2019, I electronically filed the foregoing **Defendant's Motion for Variant Sentence** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the Court and the United States Attorney's Office.


*s/ Leni Charles*
Leni Charles, Legal Assistant